**CONTINUATION IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Gregory Pond, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I was a Police Officer for five years prior to being hired by the Drug Enforcement Administration (DEA) as a Special Agent. I have been employed by the DEA for 16 years. I have worked in St. Louis, Missouri; Afghanistan; and Kalamazoo, Michigan, conducting investigations of illegal drug trafficking involving international and inter-state drug trafficking organizations and possession of firearms by convicted felons. I have received specialized drug trafficking training beginning with the DEA Training Academy and including continuous in-service training during my career with the DEA. I have participated in hundreds of investigations and served as an Affiant for multiple federal search warrant affidavits.

2. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C) and the use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b). During my time as a Special Agent, I have participated in investigations of unlawful drug trafficking and money laundering and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. I have participated in multiple federal wire intercept investigations. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers.

3. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a cellular phone described in Attachment A (the "Target Device"), which is currently in law enforcement's possession, and the extraction from the Target Device of electronically stored information described in Attachment B.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, investigators, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. § 841 (Distribution of Controlled Substances) have been committed by Daniel DONLEY. There is also probable cause to believe that the information described in Attachment B will constitute evidence of these criminal violations.

## PROBABLE CAUSE

6. Since early May, 2021, Michigan State Police (MSP) Southwest Enforcement Team (SWET) narcotics investigators have been investigating the drug trafficking activities of Daniel Ryan DONLEY in the St. Joseph County, Michigan area. As part of that investigation, a SWET undercover (UC) Detective made contact with DONLEY via the cellular phone texting application Snapchat. Messages exchanged in Snapchat are not saved on the cellular phones by default. If a user of Snapchat saves a message within the Snapchat application, the accompanying user is notified that messages are being saved by the other party. Likewise, if a user of Snapchat takes a screenshot of messages within the Snapchat application, the other user is notified. In an effort to prevent jeopardizing the investigation, the SWET UC Detective did not initiate the saving of text messages exchanged with DONLEY within Snapchat, as DONELY would have been notified of messages being saved by the UC Detective.

7. The SWET UC Detective was given DONLEY's Snapchat username by a MSP confidential source who indicated DONLEY was possibly selling drugs via his Snapchat username

"Donley84," using a screen name of "D." It should be noted DONLEY's year of birth is 1984, which bolstered investigators' belief that Daniel Ryan DONLEY was the actual user of Snapchat username "Donley84." The MSP UC Detective contact DONLEY for the first time by sending a message from an MSP UC cellular phone to "Donley84" requesting to purchase drugs. The Snapchat user of "Donley84" agreed to meet the MSP UC to conduct a hallucinogenic mushroom transaction.

8. On 05-03-2021 the MSP UC Detective was directed by DONLEY to meet DONLEY at 1560 E. Chicago Road, Sturgis, Michigan, a Marathon gas station parking lot, in order to complete the deal for hallucinogenic mushrooms. The MSP UC paid $200.00 USC for approximately 32 grams of suspected hallucinogenic mushrooms from a subject later positively identified as Daniel Ryan DONLEY by DONLEY's Michigan driver license photograph. DONLEY arrived to the 05-03-2021 drug transaction driving a maroon 2008 Chevrolet Impala, Michigan registration EAJ 7399, VIN 2G1WT58KX81249614, owned by DONLEY's father Richard DONLEY.

9. On 05-27-2021 the MSP UC Detective again contact DONLEY via Snapchat, and DONLEY agree to sell the UC Detective 75 "hits" (doses) of "acid" (LSD) for $300.00 USC. DONLEY directed the UC Detective to the La Esperanza grocery store parking lot at 300 N. Centerville St., Sturgis, Michigan. DONLEY arrived to the 05-27-2021 drug transaction driving the same maroon 2008 Chevrolet Impala, Michigan registration EAJ 7399 and sold the UC Detective approximately 75 doses of LSD concealed in a Big Red chewing gum package for $300.00 USC.

10. On 06-01-2021 the MSP UC Detective contacted DONLEY via Snapchat, and DONLEY agreed to sell the UC Detective 75 doses of LSD for $300.00 USC and 11 capsules of "Molly" (MDMA) for $80.00 USC. DONLEY directed the UC Detective to meet DONLEY at the same Marathon gas station parking lot, located at 1560 E. Chicago Road, Sturgis, Michigan, where the two had met for the 5-3-2021 deal. DONLEY arrived in the same maroon 2008 Chevrolet Impala and sold the UC Detective 75 doses of LSD for $300.00 USC and 11 capsules (approximately 2.7 grams) of MDMA for $80.00 USC.

11. On 06-07-2021, MSP SWET investigators obtained a St. Joseph County, Michigan, 3B District Court search warrant from the Honorable Magistrate Mark Trowbridge, for installation of a GPS tracking device on the 2008 Chevrolet Impala that DONLEY had driven to each of the prior drug transactions with the UC Detective. The court signed the warrant, and the GPS tracking device was installed on the 2008 Impala on 06-08-2021.

12. On 06-10-2021 the MSP UC Detective contacted DONLEY via Snapchat, and DONLEY agreed to sell the UC Detective 100 doses of LSD for $400.00 USC. DONLEY directed the UC Detective to meet DONLEY at the same Marathon gas station parking lot located at 1560 E. Chicago Road, Sturgis, Michigan. DONLEY arrived in the same maroon 2008 Chevrolet Impala, equipped with the MSP SWET GPS tracking device and sold the UC Detective 100 doses of LSD for $400.00.

13. On 06-25-2021 the MSP UC Detective contacted DONLEY via Snapchat, and DONLEY agreed to sell the UC Detective 250 doses of LSD and an amount of MDMA for $1,000.00 USC. DONLEY directed the UC Detective to meet DONLEY at the BP gas station parking lot located at 1159 N. Nottawa St., Sturgis, Michigan. DONLEY arrived in the same maroon 2008 Chevrolet Impala and sold the UC Detective 250 doses of LSD and approximately 1.5 grams of MDMA for $1,000.00 USC.

14. On 07-08-2021 the MSP UC Detective contacted DONLEY via Snapchat, and DONLEY agreed to sell the UC Detective 250 doses of LSD for $1,000.00 USC. On 07-09-2021 DONLEY directed the UC Detective to meet DONLEY at the same Marathon gas station parking lot located at 1560 E. Chicago Road, Sturgis, Michigan. DONLEY arrived in the same maroon 2008 Chevrolet Impala and sold the UC Detective 250 doses of LSD for $1,000.00 USC.

15. On 07-20-2021 the MSP UC Detective contacted DONLEY via Snapchat, and DONLEY agreed to sell the UC Detective 250 doses of LSD for $1,000.00 USC. The UC Detective directed DONLEY to meet DONLEY at the same BP gas station parking lot located at 1159 N. Nottawa St., Sturgis, Michigan. DONLEY arrived in the same maroon 2008 Chevrolet Impala. Surveillance officers saw DONLEY open the trunk of the Impala and then walk over to meet with the UC Detective. During

the meeting, DONLEY sold the UC Detective 250 doses of LSD for $1,000.00 USC. A buy/bust operation was then initiated by the SWET investigators who approached, identified themselves as police, and arrested DONLEY at the conclusion of the 07-20-2021 transaction, recovering the $1,000.00 USC buy money. A subsequent search of DONLEY resulted in the seizure of $2,490.00 USC, which included $160.00 USC of the prerecorded law enforcement buy funds from the 07-09-2021 drug buy from DONLEY. DONLEY's 2008 Impala was also searched and in the trunk investigators found a loaded 9mm pistol, marijuana, and additional LSD.

16. On 07-20-2021 MSP SWET investigators obtained a St. Joseph County, Michigan, 3B District Court search warrant from the Honorable Magistrate Mark Trowbridge, for the residence of Daniel Ryan DONLEY located at 31419 Fawn River Rd., Sturgis, Michigan. DONLEY's residence is owned/lived in by DONLEY's parents Richard L. Donley and Traci Carol Donley. Investigators also obtained a 3B District Court search warrant for an abandoned residence owned by DONLEY's parents located at 31455 Fawn River Rd., Sturgis, Michigan.

17. On 07-20-2021 MSP SWET investigators executed the state of Michigan search warrant at 31419 Fawn River Road, the residence of DONLEY and his parents. During the execution of the search warrant, SWET investigators numerous items of evidentiary value. The search warrant for 31455 Fawn River Road was executed by SWET investigators on 07-20-2021, and the residence appeared to be abandoned. Nothing of evidentiary value was seized.

18. Investigators seized the Target Device from DONLEY incident to his arrest during the 7-20-2021 buy/bust operation. The Target Device is described as a black Apple iPhone 12 Pro Max, serial # F2LF45UP0D3Y. On 07-22-2021, MSP SWET investigators obtained a St. Joseph County, Michigan, 3B District Court search warrant from the Honorable Magistrate Mark Trowbridge for the Apple iPhone (the Target Device) seized from DONLEY.[1] The Target Device is currently in the custody of the DEA.

---

[1] This warrant was obtained as part of the state investigation. DONLEY has now been indicted in federal court on nine counts of drug trafficking and illegal firearms possession, *see* Case No. 1:22-cr-00003-JMB. Given the brevity of the state search

19. Based on my experience and training, I know (a) that the quantities of psilocybin, MDMA, and LSD purchased from DONLEY during this investigation are consistent with drug trafficking rather than personal use; (b) that these quantities reflect an intent to distribute; (c) that LSD, MDMA, and psilocybin are Schedule I controlled substances; and (d) drug traffickers commonly use cellular phones to facilitate drug trafficking.

20. On the basis of the information contained in this continuation, my experience and training, and on the basis of other information that I have reviewed and determined to be reliable, probable cause exists to believe that evidence of drug trafficking involving Daniel Ryan DONLEY and other co-conspirators will be stored or contained in the Target Device.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

21. The Target Device to be examined is a black Apple iPhone 12 Pro Max, serial # F2LF45UP0D3Y. The Target Device is currently in the possession of the Drug Enforcement Administration, Grand Rapids, Michigan.

22. The applied-for warrant would authorize the forensic examination of the Target Device for the purpose of identifying electronically-stored data particularly described in Attachment B.

23. Based upon my training and experience, as well as the training and experience of others, I understand the following about drug traffickers:

   a. People engaged in drug trafficking frequently utilize cellular telephones to facilitate their transactions. Cellular telephones are portable, and many mobile telecommunications service providers do not require purchasers of the device to provide their names and/or addresses, so narcotics traffickers often use the device in an effort to avoid detection by law enforcement.

   b. Mobile phones often contain evidence indicative of drug trafficking, including records of incoming and outgoing calls; text messages; emails, photographs of drugs, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System (GPS) data indicating the location of the device at given points in time. Additionally, drug traffickers typically maintain and use multiple mobile phones to facilitate sales, and frequently switch phones to evade detection by law enforcement. Further, these types of devices are

---

warrant, however, federal investigators are seeking the warrant requested herein as part of the federal investigation into DONLEY's drug trafficking activities rather than relying on the state warrant that was previously obtained.

      frequently used to access social media websites such as Facebook, Instagram, Snapchat, and Twitter, etc.  Based on my training and experience, and the training and experience of other law enforcement agents, drug traffickers are using social media with increasing frequency to communicate with suppliers and purchasers of narcotics, particularly applications like Snapchat that do not retain the messages for extended periods of time.

    c. Persons who sell drugs will often keep documents, phone numbers of other drug dealers, and phone numbers of their drug sources stored within their cellular telephones.

    d. Drug traffickers often take, or cause to be taken, photographs and videos of themselves, their associates, their property and/or their drugs, often storing them on their cellular telephones.

24. Based on the foregoing recitation of facts, and in light of my training and experience, as well as the training and experience of other law enforcement officers, I submit that there is probable cause to believe that the Target Device, listed in Attachment A, contains historical information concerning call activity; information stored in the phone's "phonebook" or "contacts" directory; stored voice-mails; emails; text messages; electronic files; photographs; video images; and records of internet searches and transactions that are evidence of violations of federal controlled substance laws.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. The requested warrant would authorize the extraction and copying of electronically store information, all under Rule 41(e)(2)(B).

26. Based on my knowledge, training, and experience, I know that cellular phones can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensics tools.

27. Forensic evidence.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Device was used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Target Device because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  With regard to computers and hard drives, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b. Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Target Device to human inspection in order to determine whether it is evidence described by the warrant.

29. *Manner of execution*.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

30.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Device described in Attachment A to seek the items described in Attachment B.